UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHRIS YOUNG,

               Plaintiff,

      v.

DOCUSIGN INC., a Delaware Corporation, qualified to do Business and doing substantial business in Washington,

               Defendant.

No.  2:19-cv-00236-BJR

DECLARATION OF MATTHEW JEDRESKI IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS UNDER RULE 12(B)(6)

**HEARING DATE: FRIDAY, MAY 3, 2019**

I, Matthew Jedreski, declare and state as follows:

1.  I am an attorney at the law firm of Davis Wright Tremaine LLP and counsel for Defendant, DocuSign, Inc., in the above captioned case. I am over the age of 18 and am competent to testify to the facts stated herein. The following statements are based on my personal knowledge and if called to testify as a witness I could testify to them competently.

2.  Attached hereto as **Exhibit 1** is a true and correct copy of a complaint served on DocuSign on December 18, 2018.  On December 19, 2018, I requested in writing that Plaintiff file the complaint with the King County Superior Court within 14 days pursuant to Washington Civil Court Rule 3.  On December 20, 2018, I met with Mr. Young's counsel – George Tamblyn and Jason Gillis – in person and detailed the reasons why Mr. Young's previous lawsuit failed to state a cause of action, and why DocuSign would move to dismiss it if Mr. Young did not amend.  Ultimately, plaintiff never amended or filed the prior complaint as

DECLARATION OF MATTHEW JEDRESKI
ISO DEFENDANT'S MOTION TO DISMISS - 1
4836-4986-6888v.1 0096845-000009

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

requested, and by operation of law the complaint and service were void. *See* Wash. Civil Court Rule 4; *Poole v. Olsen*, 88 Wn.App. 1026 (1997) (because plaintiff "received a written demand to file the summons and complaint and failed to timely file those pleadings in the superior court within 14 days of the…demand, service against [defendant] was void….").

3. Plaintiff filed and served a new lawsuit with different allegations and causes of action on January 29, 2019. *See* Dkt. # 1-1 (the "Complaint").

4. DocuSign intended to move for dismissal of the Complaint, and met-and-conferred with plaintiff per this Court's standing civil order. Attached as **Exhibit 2** is a true and correct copy of my February 21, 2019 email to plaintiff's counsel reflecting our phone call and furthering our meet-and-confer efforts. As a result, plaintiff agreed to file an amended complaint, and the parties stipulated to a new pleading schedule.

5. Attached hereto as **Exhibit 3** is a true and correct copy of the Confidential Information, Invention Assignment, Non-Competition and Arbitration Agreement, which includes as Exhibit B thereto the Code of Ethics plaintiff references and relies on in his First Amended Complaint ("FAC"), ¶ 6.2.

6. Attached hereto as **Exhibit 4** is a true and correct copy of DocuSign's Code of Conduct, which plaintiff references and relies on in his FAC, ¶ 6.2.

7. Attached hereto as **Exhibit 5** is a true and correct copy of the Restricted Stock Units ("RSU Agreement") which plaintiff references and relies on in his FAC, ¶ 6.2.

8. Plaintiff failed to file an amended complaint on the date ordered by the Court. After plaintiff filed his First Amended Complaint ("FAC") on March 28, 2019, DocuSign again determined it would file a motion to dismiss. On April 5, 2019, DocuSign counsel spoke with plaintiff's counsel (Mr. Gillis) by phone regarding the deficiencies with the FAC. I again detailed each basis for the motion, claim-by-claim, and repeated those deficiencies in an email. Young's counsel responded on April 8, 2019 that they believed the FAC stated valid claims and they would not dismiss or amend any causes of action. Attached as **Exhibit 6** is a true and correct copy of our email exchange.

DECLARATION OF MATTHEW JEDRESKI
ISO DEFENDANT'S MOTION TO DISMISS - 2
4836-4986-6888v.1 0096845-000009

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1        I declare under penalty of perjury that the foregoing is true and correct to the best of my

2 knowledge.

3        Signed this 11th day of April, 2019 at Seattle, Washington.

*/s/ Matthew Jedreski*
Matthew Jedreski, WSBA #50542

DECLARATION OF MATTHEW JEDRESKI
ISO DEFENDANT'S MOTION TO DISMISS - 3
4836-4986-6888v.1 0096845-000009

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**DECLARATION OF SERVICE**

I hereby declare under penalty of perjury under the laws of the United States and the State of Washington, I electronically filed the above document with the Clerk of the Court using the CM/ECF system and will send notification of such filing to the following:

George O. Tamblyn
Mercer Island Law Group, PLLC
2448 76th Avenue SE, Suite 100
Mercer Island, WA 98040
P: (206) 236-2769
F: (206) 236-1893
gtamblyn@mercerlg.com

*Via Email and U.S. Mail*

DATED this 11th day of April, 2019.

  s/Valerie Macan
Valerie Macan, Secretary

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

# EXHIBIT 1

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| **CHRIS YOUNG**<br><br>**Plaintiff,**<br><br>v .<br><br>**DOCUSIGN INC.** a Delaware Corporation, qualified to do Business and doing substantial business in Washington,<br><br>Defendant. | NO.<br><br>**COMPLAINT**<br><br>**1. FOR DECLARATORY JUDGMENT** (ARBITRATION AGREEMENT UNENFORCEABLE – TERMINATION INVALID)<br>**2, SUIT FOR DAMAGES**<br><br>**PLAINTIFF ASKS FOR JURY TRIAL (12)** |

### INTRODUCTION

Plaintiff, Chris Young ("Young"), an experienced sales manager with a good existing sales position was offered a position as Regional Vice President with DocuSign in Seattle in July of 2017. He was offered $130,000 in salary (which was approximately what he had been making in his then position) but, as a very important addition: a stock bonus incentive plan.  He was told, at his hiring, that DocuSign was going public within the year and that the stock would be worth a lot of money. Based on this representation, Young took the job with DocuSign1. Young did an excellent job for DocuSign and greatly increased sales revenue. Pursuant to his Stock Incentive

COMPLAINT - 1

plan, he was awarded substantial stock grants, many of which would vest on or about August 1, 2018. Earlier in 2018, DocuSign's stock became public and greatly increased in value.

On July 27, 2018, Young was accused of violating the DocuSign "Code of Conduct," a vague, flowery, general statement regarding DocuSign's business principles. The specific charge was misrepresenting his title in a sales transaction (not mentioned in the Code of Conduct). Young had several defenses to the charge which he attempted to assert, but in a matter of a few hours, his statements were ignored and not investigated, and he was fired; significantly, three days before some of his stock grants would vest. Young was offered no opportunity to appeal and did not have any opportunity to discuss his situation with a lawyer. All his lost stock grants have a value (depending on what dates are used for valuation) of about $1,000,000. In addition, he lost the opportunity to earn more stock grants pursuant to his particular plan and his firing caused immediate loss of earnings, together with his emotional damages, damage to his reputation, could justify a claim of an additional $4,000,000.

There was a defective Arbitration Agreement in place, which this suit for Declaratory Judgment will strongly assert, for several reasons, is unenforceable.

**Plaintiff alleges:**

## I.  PARTIES, JURISDICTION AND VENUE

1.1   Young is a resident of King County, Washington and was employed by DocuSign1 in July, 2017 until an incident on or about July 26 and July 27, 2018 when DocuSign purported to terminate Young and expelled him from DocuSign's business premises.

1.2 Defendant, DocuSign, is a Delaware Corporation that is the successor, in some form, of an earlier DocuSign ("DocuSign1"). The change took place after Young was employed by

COMPLAINT - 2

Docusign1 and before his alleged termination. At all times were both DocuSigns doing business in Seattle Washington and qualified to do business in the State of Washington.

## II. FACTUAL ALLEGATIONS

2.1     According to the documents signed by Young and authorized Agents of DocuSign1, employment disputes are to be decided by arbitration with the American Arbitration Association ("AAA"). The arbitration is to be conducted in Seattle, Washington, pursuant to the AAA rules. Among other conditions in the DocuSign documents was a provision that Young and DocuSign1 split the costs of arbitration by AAA. This division of costs is not authorized by the rules of AAA. Furthermore, AAA requires employers designating AAA as arbitrator to submit their arbitration agreements to AAA as a requirement for arbitration. On information and belief, DocuSign1 did not submit its plan as required. The arbitration requirement is flawed in other crucial ways and, as a result, it is not legally enforceable.

2.2     The procedure forced upon Young that resulted in his expulsion from DocuSign in July 2018, was unfair and did not offer Young the semblance of due process. He was not allowed the time to defend himself against the pretext that he had perpetrated a gross violation of the company's "Code of Conduct" and the real motive was to deprive him of the stock bonuses he had been promised and given before the company went public and the stock greatly increased in value. The company did not act with good faith and fair dealing as required by law. He was denied contract rights that were provided to protect him from arbitrary termination.

2.3     Young's performance in his sales position was stellar. He greatly increased DocuSign's sales and profitability and was personally responsible for the increasing stock value after the public

COMPLAINT - 3

stock offering in the Spring of 2018.  Pursuant to his written employment contract, he was entitled to substantial stock grants, some of which would vest on August 1, 2018.  He had negotiated an employment contract, prior to the public offering, that was exceptional and apparently, he appeared to be reaping rewards that far exceeded others, more senior to him in the Company.

2.4     The incident that precipitated his termination involved a request by one of Young's salesmen to assist him with a potential sales opportunity.  In order to impress the customer, Young was asked to meet with the customer and discuss the potential sale.  The salesman requested that Young add another title to his email to the customer.  This was a common practice in DocuSign called "ghost emails."  Young's salesman apparently told Young that the customer was the "Compliance Officer."  Young, travelling at the time and, somewhat confused, inserted "Compliance Officer" into the email to the Customer. He also included his actual title, "Regional Vice President." The customer did not respond to the email did not contact DocuSign. Somehow, this came to the attention of Reggie Davis, the General Counsel of DocuSign (and, coincidentally, DocuSign's Compliance Officer and, himself a substantial shareholder).  Davis, without any discussion with Young, immediately directed Molly Lambright (HR) to investigate.  Lambright, also a substantial shareholder, confronted Young, who tried to explain how what occurred was not intentional, a mistake, a misunderstanding, a common practice in such sales situations, and had no adverse effect on anyone.  Lambright would not listen to Young, conferred with Davis and told Young he was terminated, and he was escorted off the premises.  All his stock rights were cancelled, thus increasing the value of all remaining shareholders' shares.  All of this occurred in a matter of a few hours.  Despite multiple requests to Lambright by Young to speak to Davis, he was not permitted to do so. His termination was a violation of his employment contract.

COMPLAINT - 4

## III. CLAIMS OR CAUSES OF ACTION

### (DECLARATORY JUDGMENT)

3.1 Invalidate the Arbitration agreement and order a trial by jury.

### IV. DEMAND

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

1. Declaratory Judgment invalidating the Arbitration Agreement.

2. Money Judgment for the damages suffered by Plaintiff.

3. Pre-Judgment Interest.

4. Attorneys' Fees allowable by contract or law.

5. Such other relief as the Court deems appropriate in accordance with law.

DATED:  December 18, 2018.

MERCER ISLAND LAW GROUP, PLLC

By: _George O. Tamblyn_

George O. Tamblyn WSBA #15429
Attorney for Plaintiff
gtamblyn@mercerlg.com

**MERCER ISLAND LAW GROUP, PLLC**
2448 76TH AVE SE, SUITE 100
MERCER ISLAND, WA  98040
206-236-2769

# EXHIBIT 2

| From: | Jedreski, Matt |
|---|---|
| Sent: | Thursday, February 21, 2019 11:27 AM |
| To: | George Tamblyn; Jason Gillis |
| Cc: | Hess, Ryan; Garner, Mary |
| Subject: | Young v. DocuSign: meet-and-confer over motion to dismiss |

Hi, George:

Thanks for the phone call today. To recap, I noted our obligation under Judge Rothstein's standing order to meet-and-confer prior to filing a motion to dismiss, and that we intended to file such a motion on Tuesday (our deadline to do so). I detailed the bases for our motion, which I said I'd also provide in writing (they are stated below), and asked that plaintiff consider whether he would voluntarily dismiss some or all of his claims. You said you would consider what I told you and this email, and that we could arrange a phone call on Monday during which you'd relay plaintiff's position (or that you might be able to respond sooner by email).

Here are the reasons why the complaint fails to state valid causes of action:

1. **Contract claims**
   - The cited provisions in the DocuSign Code of Conduct are not enforceable contracts; for an employment policy to be an enforceable contract under WA law, it must promise the employee will be treated a specific way in a specific situation.
   - There is no allegation DocuSign breached the RSU agreement
   - None of the alleged contracts at issue altered plaintiff's at-will employment
2. **Misrepresentation claims**
   - The "misrepresentation" alleged from the Code of Conduct is not one of existing fact, it is – at most – a nonactionable statement of subjective future intent.
   - There additionally is no claim under the WSSA because the grant of RSUs was not a "sale" of stock, and the alleged misrepresentation did not relate to the sale of a security.
3. **Conversion**
   - Plaintiff did not "possess" the unvested shares of stock, and DocuSign did not "unlawfully possess" the unvested shares when plaintiff forfeited them by virtue of the plain terms of the RSU Agreement
4. **Unjust enrichment**
   - This is an equitable "quasi-contract" claim that plaintiff cannot invoke because there is an actual contract defining the parties' rights (the RSU Agreement controls)
5. **Age discrimination/wrongful termination claims**
   - There are insufficient factual allegations to support either claim, particularly where plaintiff's prior complaint listed a completely different theory and alleged basis for his termination
6. **Declaratory judgment**
   - As noted in December and again in our call, DocuSign will not move to compel arbitration of the existing allegations/causes of action

As I noted, these are fundamental flaws in plaintiff's theories and we do not believe they can be cured by amendment. Please let us know by Monday if plaintiff will agree to dismiss any or all of these causes of action; I am generally free for a call on Friday or Monday if you would like to discuss further. We appreciate your attention to this on such a short time-frame – we did not know about a meet-and-confer obligation until we got the judge assignment yesterday.

Thanks,
Matt

**Matthew Jedreski** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8147 | Fax: (206) 757-7147
Email: mjedreski@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

# EXHIBIT 3

DocuSign Envelope ID: E8790ED8-1CE3-4E53-B7A9-C9FA096EC628

**DOCUSIGN, INC.**
**CONFIDENTIAL INFORMATION,**
**INVENTION ASSIGNMENT,**
**NON-COMPETITION**
**AND ARBITRATION AGREEMENT**

As a condition of my employment with DocuSign, Inc., its subsidiaries, affiliates, successors or assigns (together the "**Company**"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, I agree to the following:

## 1.     AT-WILL EMPLOYMENT

MY EMPLOYMENT WITH THE COMPANY IS FOR AN UNSPECIFIED DURATION AND CONSTITUTES "AT-WILL" EMPLOYMENT.  ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS OBTAINED IN WRITING AND SIGNED BY THE PRESIDENT OF THE COMPANY.  THIS EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT EITHER MY OPTION OR THE COMPANY'S OPTION, WITH OR WITHOUT NOTICE.  NOTHING IN AN EMPLOYEE HANDBOOK OR OTHER POLICY OF THE COMPANY WILL BE CONSTRUED AS CHANGING MY AT-WILL EMPLOYMENT STATUS.



## 2.     CONFIDENTIAL INFORMATION

2.1     Definition.  I understand that "**Company Confidential Information**" means information (including any and all combinations of individual items of information) that the Company has or will develop, acquire, create, compile, discover or own, that has value in or to the Company's business which is not generally known and which the Company wishes to maintain as confidential. Company Confidential Information includes both information disclosed by the Company to me, and information developed or learned by me during the course of my employment with Company. Company Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of Company, whether or not such information is identified as Company Confidential Information. By example, and without limitation, Company Confidential Information includes any and all non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, discoveries, ideas, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company property. Notwithstanding the foregoing, Company Confidential Information shall not include any such information which I can establish (i) was publicly known

(30442)

DocuSign Envelope ID: E8790ED8-1CE3-4E53-B7A9-C9FA096EC628

or made generally available prior to the time of disclosure by Company to me; (ii) becomes publicly known or made generally available after disclosure by Company to me through no wrongful action or omission by me; or (iii) is in my rightful possession, without confidentiality obligations, at the time of disclosure by Company as shown by my then-contemporaneous written records; provided that any combination of individual items of information shall not be deemed to be within any of the foregoing exceptions merely because one or more of the individual items are within such exception, unless the combination as a whole is within such exception. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

      2.2    <u>Non-Use and Non-Disclosure</u>.  I agree that during and after my employment with the Company, I will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Company Confidential Information, and I will not (i) use the Company Confidential Information for any purpose whatsoever other than for the benefit of the Company in the course of my employment, or (ii) disclose the Company Confidential Information to any third party without the prior written authorization of the President, CEO, or the Board of Directors of the Company. Prior to disclosure when compelled by applicable law; I shall provide prior written notice to the President, CEO, and General Counsel of DocuSign, Inc. (as applicable). I acknowledge and agree that information relating to identified or identifiable individuals accessed, received, or used during the course of my employment with the Company must be kept secure and confidential, and may not be accessed, used, or shared for any purpose other than in connection with and to the extent necessary for my work, or as otherwise required by applicable law.  Whenever feasible, I will consult a supervisor or a member of the Company's legal department if I believe there is a legal obligation to disclose proprietary information.  I agree that I obtain no title to any Company Confidential Information, and that as between Company and myself, DocuSign, Inc. retains all Confidential Information as the sole property of DocuSign, Inc. I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company. I understand that my obligations under this Section 2 shall continue after termination of my employment.

      2.3    <u>Former Employer Information</u>.  I agree that during my employment with the Company, I will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity with which I have an obligation to keep in confidence. I further agree that I will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such third party unless disclosure to, and use by, the Company has been consented to in writing by such third party.

      2.4    <u>Third Party Information</u>.  I recognize that the Company has received and in the future will receive from third parties associated with the Company, e.g., the Company's customers, suppliers, licensors, licensees, partners, or collaborators ("**Associated Third Parties**"), their confidential or proprietary information ("**Associated Third Party Confidential Information**") subject to a duty on the Company's part to maintain the confidentiality of such Associated Third Party Confidential Information and to use it only for certain limited purposes.

By way of example, Associated Third Party Confidential Information may include the habits or practices of Associated Third Parties, the technology of Associated Third Parties, requirements of Associated Third Parties, and information related to the business conducted between the Company and such Associated Third Parties. I agree at all times during my employment with the Company and thereafter, that I owe the Company and its Associated Third Parties a duty to hold all such Associated Third Party Confidential Information in the strictest confidence, and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out my work for the Company consistent with the Company's agreement with such Associated Third Parties. I further agree to comply with any and all Company policies and guidelines that may be adopted from time to time regarding Associated Third Parties and Associated Third Party Confidential Information. I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information or violation of any Company policies during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company.

**3. INVENTIONS**

3.1 <u>Inventions Defined</u>. "**Inventions**" means inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, know-how, trademarks, and trade secrets, whether or not patentable or registrable under copyright or similar laws, that I may solely or jointly conceive, develop, or reduce to practice.

3.2 <u>Assignment of Inventions and Works Made for Hire</u>. I will promptly make a full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all of my right, title, and interest (including all related intellectual property rights) in all Inventions that I create during the period of time I am in the employ of the Company ("**Company Inventions**"). In addition, all original works of authorship that are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act, and in accordance, the Company will be considered the author of these works.

3.3 <u>Exception to Assignments</u>. I am not obligated to assign any Company Invention that qualifies fully under the provisions of the Revised Code of Washington Section 49.44.140 ("**RCW 49.44.140**"), which is included below. In addition, I will advise the Company promptly in writing of any Inventions that I believe meet the criteria in RCW 49.44.140 and are not otherwise disclosed on **Exhibit A**.

**NOTICE OF REVISED CODE OF WASHINGTON SECTION 49.44.140:**

Any provision in this Agreement for assignment of my right, title, and interest in an Invention to the Company does not apply to an Invention for which no equipment, supplies, facilities, or trade secret information of the Company was used and which was developed entirely on my own time, unless (a) the Invention relates (i) directly to the business of the Company, or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) the Invention results from any work I perform for the Company.

3.4     <u>Inventions Retained and Licensed</u>.  I have attached to this Agreement, as **Exhibit A**, a list describing all Inventions that were made by me prior to my employment with the Company, that relate to the Company's proposed business, products, or research and development, and that are not assigned to the Company under this Agreement (collectively, "**Prior Inventions**").  If no list is attached, I represent that there are no Prior Inventions.  If in the course of my employment with the Company, I incorporate into a Company product, process, or machine a Prior Invention owned by me or in which I have an interest, the Company is granted a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license to make, have made, modify, use, and sell the Prior Invention without restriction of any kind.

3.5     <u>Third Party Inventions</u>.  I will not incorporate any original work of authorship, development, concept, improvement, or trade secret owned, in whole or in part, by any third party, into any Company Invention without the Company's prior written permission.

3.6     <u>Marketing of Company Inventions</u>.  The decision whether or not to commercialize or market any Company Invention developed by me solely or jointly with others is within the Company's sole discretion and for the Company's sole benefit.  Neither the Company nor any other entity will pay me a royalty as a result of the Company's efforts to commercialize or market any Company Invention.

3.7     <u>Inventions Assigned to the United States</u>.  I will assign to the United States government all of my right, title, and interest in and to all Company Inventions whenever the full title is required to be assigned to the United States government by a contract between the Company and the United States government or any of its agencies.

3.8     <u>Maintenance of Records</u>.  I will keep and maintain adequate and current written records of all Company Inventions.  These records will be in the form of notes, sketches, drawings, laboratory notebooks, and any other format that may be specified by the Company.  At all times, the records will be available to the Company, and remain the sole property of the Company.

3.9     <u>Further Assurances</u>.  I will assist the Company, or its designee, at the Company's expense, in every proper way to secure and protect the Company's rights in Company Inventions and any related copyrights, patents, mask work rights, or other intellectual property rights in any and all countries.  I will disclose to the Company all pertinent information and data.  I will execute all applications, specifications, oaths, assignments, and all other instruments that the Company deems necessary in order to apply for and obtain these rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to Company Inventions, and any related copyrights, patents, mask work rights, or other intellectual property rights.  My obligation to execute or cause to be executed, when it is in my power to do so, any instrument or papers will continue after the termination of this Agreement.  If the Company is unable because of my mental or physical incapacity or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering Company Inventions or original works of authorship assigned to the Company as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact.  Accordingly, the Company may act for and in my behalf to execute

DocuSign Envelope ID: E8790ED8-1CE3-4E53-B7A9-C9FA096EC628

and file any applications and to do all other lawfully permitted acts to further the prosecution and issuance of patent or copyright registrations with the same legal force and effect as if executed by me.

### 4. NO CONFLICTING EMPLOYMENT

During the term of my employment with the Company, I will not engage in any other employment, occupation, consulting, or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of my employment. I will also not engage in any other activities that conflict with my obligations to the Company, and further will devote my full time efforts to the Company, if my position is for full time employment. I agree to refrain from engaging in any ongoing activities outside the Company for compensation of any sort (including self-employment) unless approved in writing and in advance, in accordance with the Company's "moonlighting" and any other related policies.

### 5. COMPLIANCE WITH COMPANY POLICIES AND USE OF COMPANY EQUIPMENT AND FACILITIES

I will comply with all Company policies, including but not limited to policies relating to the use of the Internet and the use of Company equipment and facilities. I will not use Company equipment or facilities for any purpose except to fulfill my employment obligations for the benefit of the Company. I will follow all laws and regulations applicable to the use of Company equipment and facilities and access to or use of others' computer or communication systems. I acknowledge that the Company will maintain sole ownership of all equipment and any data stored on the equipment. I understand and consent that the Company reserves the right to view and disclose without prior notice, for any purpose, any data stored on Company equipment or passing through the Company's network, including but not limited to electronic mail and data downloaded from the Internet. I acknowledge that I have no expectation of privacy either in information in transit through the Company network or stored on Company equipment.

### 6. RETURNING COMPANY DOCUMENTS

Upon leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate, or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with the Company or otherwise belonging to the Company, its successors, or assigns. In addition, I will deliver those records maintained pursuant to Section 3.8 to the Company.

### 7. NOTIFICATION TO NEW EMPLOYER

If my employment with the Company ends for any reason or no reason, the Company may notify my new employer about my rights and obligations under this Agreement.

### 8. TERMINATION CERTIFICATION

DocuSign Envelope ID: E8790ED8-1CE3-4E53-B7A9-C9FA096EC628

In the event of the termination of my employment, I agree to sign and deliver to the Company the "**Termination Certification**" attached to this Agreement as **Exhibit C**.

## 9. NON-COMPETITION

9.1 <u>Non-Competition</u>. In order to protect Confidential Information, I will not, during and for a period of twelve (12) months after the end of my employment with the Company, whether my termination is with or without good cause or for any or no cause, and whether my termination is effected by either the Company or me, directly or indirectly, for myself or any third party other than the Company:

(a) provide services of any kind for any business (within the Geographic Area, as defined below) in connection with the development, manufacture, marketing, or sale of any product or service that I worked on in any capacity or in connection with which I had access to Confidential Information at any time during my employment with the Company, if the business's product or service (i) competes with any product or service sold or provided by the Company, (ii) competes with any product or service intended to be sold or provided by the Company at the time of the termination of my employment with the Company, or (iii) competed with any product or service sold or provided by the Company at any time during my employment with the Company;

(b) solicit sales from any of the Company's customers for any product or service that (i) competes with any product or service sold or provided by the Company, (ii) competes with any product or service intended to be sold or provided by the Company at the time of the termination of my employment with the Company, or (iii) competed with any product or service sold or provided by the Company at any time during my employment with the Company;

(c) entice any vendor, consultant, collaborator, agent, or contractor of the Company to cease its business relationship with the Company or engage in any activity that would cause them to cease their business relationship with the Company; or

(d) either directly or indirectly solicit, induce, recruit, or encourage any of the Company's employees to leave their employment, or attempt to solicit, induce, recruit, encourage, or take away Company employees, either for myself or for any other person or entity.

9.2 <u>Geographic Area Definition</u>. "**Geographic Area**" means anywhere in the world where the Company conducts business.

9.3 <u>Severability</u>. The covenants contained in Section 9 will be construed as a series of separate covenants, one for each country, city, state, or any similar subdivision in any Geographic Area. If, in any judicial proceeding, a court refuses to enforce any of these separate covenants (or any part of a covenant), then the unenforceable covenant (or part) will be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions) to be enforced. In the event that the provisions of this section are deemed to exceed the time, geographic, or scope limitations permitted by law, then the provisions will be reformed to the maximum time, geographic, or scope limitations permitted by law.

9.4     Reasonableness.  The nature of the Company's business is such that if I were to become employed by, or substantially involved in, the business of a competitor to the Company soon after the end of my employment with the Company, it would be difficult not to rely on or use Confidential Information.  Therefore, I enter into this Agreement to reduce the likelihood of disclosure of Confidential Information.  I acknowledge that the limitations of time, geography, and scope of activity agreed to above are reasonable because, among other things, (a) the Company is engaged in a highly competitive industry, (b) I will have access to Confidential Information, including but not limited to, the Company's trade secrets, know-how, plans, and strategy (and in particular, the competitive strategy of the Company), (c) in the event my employment with the Company ends, I will be able to obtain suitable and satisfactory employment in my chosen profession without violating this Agreement, and (d) these limitations are necessary to protect Confidential Information, and the goodwill of the Company.

## 10.     REPRESENTATIONS

I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement.  I represent that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company.  I have not entered into, and I agree I will not enter into, any oral or written agreement in conflict with this Agreement.

## 11.     ARBITRATION AND EQUITABLE RELIEF

11.1     Arbitration.  EXCEPT AS PROVIDED IN SECTION 11.3 BELOW, I AGREE THAT ANY DISPUTE OR CONTROVERSY ARISING OUT OF, RELATING TO, OR CONCERNING ANY INTERPRETATION, CONSTRUCTION, PERFORMANCE, OR BREACH OF THIS AGREEMENT, WILL BE SETTLED BY ARBITRATION TO BE HELD IN KING COUNTY, WASHINGTON, IN ACCORDANCE WITH THE EMPLOYMENT DISPUTE RESOLUTION RULES THEN IN EFFECT OF THE AMERICAN ARBITRATION ASSOCIATION.  THE ARBITRATOR MAY GRANT INJUNCTIONS OR OTHER RELIEF IN A DISPUTE OR CONTROVERSY.  THE DECISION OF THE ARBITRATOR WILL BE FINAL, CONCLUSIVE, AND BINDING ON THE PARTIES TO THE ARBITRATION.  JUDGMENT MAY BE ENTERED ON THE ARBITRATOR'S DECISION IN ANY COURT HAVING JURISDICTION.  THE COMPANY AND I WILL EACH PAY ONE-HALF OF THE COSTS AND EXPENSES OF THE ARBITRATION, AND EACH OF US WILL SEPARATELY PAY OUR COUNSEL FEES AND EXPENSES.

11.2     Waiver of Right to Jury Trial.  THIS ARBITRATION CLAUSE CONSTITUTES A WAIVER OF EMPLOYEE'S RIGHT TO A JURY TRIAL AND RELATES TO THE RESOLUTION OF ALL DISPUTES RELATING TO ALL ASPECTS OF THE EMPLOYER/EMPLOYEE RELATIONSHIP (EXCEPT AS PROVIDED IN SECTION 11.3 BELOW), INCLUDING, BUT NOT LIMITED TO, THE FOLLOWING CLAIMS:

(a)     ANY AND ALL CLAIMS FOR WRONGFUL DISCHARGE OF EMPLOYMENT, BREACH OF CONTRACT, BOTH EXPRESS AND IMPLIED, BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING, BOTH EXPRESS AND IMPLIED, NEGLIGENT OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS,

DocuSign Envelope ID: E8790ED8-1CE3-4E53-B7A9-C9FA096EC628

NEGLIGENT OR INTENTIONAL MISREPRESENTATION, NEGLIGENT OR INTENTIONAL INTERFERENCE WITH CONTRACT OR PROSPECTIVE ECONOMIC ADVANTAGE, AND DEFAMATION;

(b) ANY AND ALL CLAIMS FOR VIOLATION OF ANY FEDERAL, STATE OR MUNICIPAL STATUTE, INCLUDING, BUT NOT LIMITED TO, TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE CIVIL RIGHTS ACT OF 1991, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE FAIR LABOR STANDARDS ACT, AND REVISED CODE OF WASHINGTON SECTION 49.60.010, *et seq.*;

(c) ANY AND ALL CLAIMS ARISING OUT OF ANY OTHER LAWS AND REGULATIONS RELATING TO EMPLOYMENT OR EMPLOYMENT DISCRIMINATION.

11.3 Equitable Remedies. THE PARTIES MAY APPLY TO ANY COURT OF COMPETENT JURISDICTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION OR OTHER INTERIM OR CONSERVATORY RELIEF, AS NECESSARY, WITHOUT BREACH OF THIS ARBITRATION AGREEMENT AND WITHOUT ABRIDGEMENT OF THE POWERS OF THE ARBITRATOR.

11.4 Consideration. I UNDERSTAND THAT EACH PARTY'S PROMISE TO RESOLVE CLAIMS BY ARBITRATION IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT, RATHER THAN THROUGH THE COURTS, IS CONSIDERATION FOR THE OTHER PARTY'S LIKE PROMISE. I FURTHER UNDERSTAND THAT I AM OFFERED EMPLOYMENT IN CONSIDERATION OF MY PROMISE TO ARBITRATE CLAIMS.

## 12. GENERAL PROVISIONS

12.1 Governing Law and Consent to Personal Jurisdiction. The internal laws of the state of Washington, but not the choice of law rules of the state of Washington, govern this Agreement. I expressly consent to the personal jurisdiction of the state and federal courts located in King County, Washington for any lawsuit filed there against me by the Company arising from or relating to this Agreement.

12.2 Entire Agreement. This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter of this Agreement. This Agreement supersedes all prior discussions between us. No modification of this Agreement or amendment to it, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged. Any subsequent change or changes in my duties, salary, or compensation will not affect the validity or scope of this Agreement.

12.3 Severability. If one or more of the provisions in this Agreement is deemed void by law, then the remaining provisions will continue in full force and effect.

12.4    <u>Successors and Assigns</u>.  This Agreement will be binding upon my heirs, executors, administrators, and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

**DOCUSIGN, INC.**

By: _____

Title: ___General Counsel_____

Date: ___July 19, 2017_____

**EMPLOYEE**

By: _____

Title: ___RVP_____

Date: ___July 19, 2017_____

___Chris Young_____
Name of Employee (typed or printed)

DocuSign Envelope ID: E8790ED8-1CE3-4E53-B7A9-C9FA096EC628

## Exhibit A

## LIST OF PRIOR INVENTIONS
## AND ORIGINAL WORKS OF AUTHORSHIP

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
| Cy | | |

_____     No inventions or improvements

_____     Additional Sheets Attached

Signature of Employee: _____

Print Name of Employee: __Chris Young_____

Date: __July 19, 2017_____

**Exhibit B**

**DOCUSIGN, INC.**

**CODE OF ETHICS**

The Company is committed to maintaining the highest standards of ethical conduct. Our Code of Ethics (this "Code") reflects the business practices and principles of behavior that support this commitment. We expect every employee to read and understand this Code and its application to the performance of his or her business responsibilities. We will hold each of our employees accountable for adherence to this Code. Those who violate this Code will be subject to disciplinary action, up to and including termination.

This Code does not describe every practice or principle related to honest and ethical conduct. The contents of the Employment Guidelines section above and the Security Policy that follows this section should be read in conjunction with this Code.

**Compliance with Applicable Laws**

All employees of the Company must comply with all of the laws, rules and regulations of the United States and other countries, as well as the states, counties, cities and other jurisdictions, applicable to the Company or its business.

This Code does not summarize all laws, rules and regulations applicable to the Company or its business. You should consult the various guidelines the Company has prepared on specific laws, rules and regulations, which you may find summarized in the Employee Handbook and on the Company's internal human resources web pages. Please consult with a supervisor or a member of the Company's legal department if you have questions about laws that you think may be applicable to the Company or its business.

**Conflict of Interest**

A "conflict of interest" may exist whenever the private interests of an employee conflict in any way (or even appear to conflict) with the interests of the Company. While our employees should be free to make personal investments and enjoy social relations and normal business courtesies, they must not have any personal interests that adversely influence the performance of their job responsibilities. A conflict situation can arise when an employee takes actions or has interests that may make it difficult to perform his or her Company work objectively. Conflicts of interest may also arise when an employee, or a member of his or her family, receives improper personal benefits as a result of his or her position in the Company, whether received from the Company or a third party. Gifts to, loans to, or guarantees of obligations of, employees and their respective family members may create conflicts of interest. Federal law prohibits personal loans from the Company to directors and executives. Absent an express written consent or waiver

DocuSign Envelope ID: E8790ED8-1CE3-4E53-B7A9-C9FA096EC628

from the Company, it is a conflict of interest for a Company employee or officer to work simultaneously for a competitor, customer or supplier.

Conflicts of interest may not always be clear-cut, so if you have a question, you should consult with a supervisor or a member of the Company's legal department. Any employee who becomes aware of a conflict or potential conflict should bring it to the attention of a supervisor or a member of the Company's legal department.

## Corporate Opportunity

Except as may be approved by the company, employees are prohibited from: (a) taking for themselves personally any opportunities that belong to the Company or are discovered through the use of corporate property, information or position; (b) using corporate property, information or position for personal gain; and (c) competing with the Company. DocuSign employees should not accept or offer payments, gifts, or benefits that would not withstand, without question, full disclosure.

You may not financially benefit from any association with the Company. Therefore, you may not offer, give, or transfer anything of value to any official, employee, or agent of any government, whether for your own or Company's benefit. You may not make any political contribution, direct or otherwise, by or on behalf of the Company. You may not give anything of value to any employee or agent or any other person or organization for any improper, unlawful, or unethical purpose. You may not accept any gift, payment, or other benefit from a current or prospective supplier, customer, competitor, or any other individual or organization that would not withstand the test of full disclosure, as defined by the judgment of an officer of the organization. Failure to abide by this policy could result in termination.

At your manager's discretion, you may provide or accept business entertainment that is reasonable in nature, frequency, and cost. Reasonable entertainment would include an occasional lunch, dinner, athletic or cultural event, gifts of nominal value, entertainment at DocuSign facilities, authorized transportation in Company vehicles, or attendance at Company-sponsored promotional events.

## Confidentiality

All employees, officers, , and directors, under the Confidential Information, Invention Assignment, Non-Competition and Arbitration Agreement contained herein, must maintain the confidentiality of proprietary information entrusted to them by the Company or its suppliers or customers, except when disclosure is authorized by the Company or required by laws, regulations or legal proceedings. Whenever feasible, employees should consult a supervisor or a member of the Company's legal department if they believe they have a legal obligation to disclose proprietary information.

DocuSign Envelope ID: E8790ED8-1CE3-4E53-B7A9-C9FA096EC628

**Fair Dealing**

Each employee should endeavor to deal fairly with the Company's customers, suppliers, competitors, officers and employees. None should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practice. Stealing proprietary information, misusing trade secret information that was obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies is prohibited.

**Protection and Proper Use of Company Assets**

All employees should protect the Company's assets and ensure their efficient use. Theft, carelessness, and waste have a direct impact on the Company's profitability. All Company assets should be used for legitimate business purposes. Of course, incidental personal use may be appropriate for certain Company assets, but you should check with a supervisor to determine what may be appropriate. See the DocuSign Security Policy elsewhere in this Handbook for classification and treatment of company assets.

**Reporting Any Illegal or Unethical Behavior**

Employees are encouraged to promptly contact supervisors, managers, the human resources department or the legal department if the Employee believes that the Employee has observed illegal or unethical behavior by any officer, director or employee or by anyone purporting to be acting on the Company's behalf and, the Employee has any doubt, about the best course of action in a particular situation. Such reports may be made anonymously. Confidentiality will be protected, subject to applicable law, regulation or legal proceeding.

When a supervisor receives reports of violations or questionable behavior pursuant to this Code of Ethics, that supervisor shall be responsible for bringing such reports to the attention of his or her supervisor or to the Board of Directors, as appropriate, in accordance with the reporting procedures contained in this Code of Ethics. Supervisors must endeavor to honor any confidentiality or anonymity requests made by the reporting person, subject to applicable law, regulation or legal proceedings.

**Enforcement**

Any violators of this Code will be subject to disciplinary action. The disciplinary actions will be determined by the Board. The Company intends such disciplinary action to reflect our belief that all employees should be held accountable to the standards of conduct set forth herein. Accordingly, such disciplinary action may include, without limitation, censure by the Board, demotion, re-assignment, suspension or termination, depending on the nature and the severity of the violation.

DocuSign Envelope ID: E8790ED8-1CE3-4E53-B7A9-C9FA096EC628

**No Retaliation**

The Company will not permit retaliation of any kind against anyone who makes a report or complaint in good faith that a violation of this Code or other illegal or unethical conduct has occurred.

Signature of Employee: _____

Print Name of Employee: Chris Young

Date: July 19, 2017

DocuSign Envelope ID: E8790ED8-1CE3-4E53-B7A9-C9FA096EC628

## Exhibit C

## DOCUSIGN, INC.

## TERMINATION CERTIFICATE

I certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to DocuSign, Inc. ("the Company"), including any Company documents that may have been uploaded to third-party websites or repositories.

I further certify that I have complied with all the terms of the Company's Confidential Information, Invention Assignment, Non-Competition, and Arbitration Agreement (the "**Agreement**") signed by me, including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by the Agreement.

Immediately following the return of any Company materials that have been stored by me or in my name on a third-party website or repositories, I agree to terminate my access to all such accounts.

I further agree that, in compliance with the Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for a period of one (1) year from this date, I will not engage in any of the activities prohibited by Section 9 of the Agreement including, without limitation, competition with the Company in the "Geographic Area" defined in Section 9.2 of the Agreement, and solicitation of employees, customers, vendors, consultants, collaborators, agents or contractors of the Company.

Signature of Employee: _____

Print Name of Employee: _____

Date: _____



## Certificate Of Completion

Envelope Id: E8790ED81CE34E53B7A9C9FA096EC628
Subject: CI/IA/NC/AA (WA) - Chris Young
EnvelopeType:
Source Envelope:
Document Pages: 15                    Signatures: 4                    Envelope Originator:
Supplemental Document Pages: 0        Initials: 1                      DocuSign HR
Certificate Pages: 5
AutoNav: Enabled                      Payments: 0                      221 Main Street
EnvelopeId Stamping: Enabled                                           Suite 1000
Time Zone: (UTC-08:00) Pacific Time (US &                              San Francisco, CA  94105
Canada)                                                                hr@docusign.com
                                                                       IP Address: 12.202.171.34

Status: Completed

## Record Tracking

Status: Original                      Holder: DocuSign HR               Location: DocuSign
        7/17/2017 10:10:06 AM                 hr@docusign.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Chris Young<br>chris.young3131@mail.com<br>Security Level: Email, Account Authentication (None) | <br>E9CF399F8EA84BC...<br><br>Using IP Address: 50.106.16.2<br>Signed using mobile | Sent: 7/17/2017 10:10:07 AM<br>Viewed: 7/19/2017 11:19:58 AM<br>Signed: 7/19/2017 11:21:02 AM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 7/7/2017 3:17:01 PM<br>    ID: 0ecb8f27-9440-443e-af37-e7d1a146eb29 | | |
| Reggie Davis<br>reggie.davis@docusign.com<br>General Counsel<br>DocuSign, Inc.<br>Security Level: Email, Account Authentication (None) | <br>4A49DB53574A417...<br><br>Using IP Address: 12.202.171.34 | Sent: 7/19/2017 11:21:04 AM<br>Viewed: 7/19/2017 2:59:41 PM<br>Signed: 7/19/2017 2:59:45 PM |
| **Electronic Record and Signature Disclosure:**<br>    Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 7/19/2017 11:21:04 AM |
| Certified Delivered | Security Checked | 7/19/2017 2:59:41 PM |
| Signing Complete | Security Checked | 7/19/2017 2:59:46 PM |

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Completed | Security Checked | 7/19/2017 2:59:46 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, DocuSign, Inc. (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign, Inc. (DocuSign) electronic signing system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after signing session and, if you elect to create a DocuSign signer account, you may access them for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of a DocuSign envelope instead of signing it. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures

electronically from us.

**How to contact DocuSign, Inc.:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

**To advise DocuSign, Inc. of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at owen.quennell@docusign.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc. to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in the DocuSign system.

**To request paper copies from DocuSign, Inc.**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to owen.quennell@docusign.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with DocuSign, Inc.**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
>
> ii. send us an e-mail to owen.quennell@docusign.com and in the body of such request you must state your e-mail, full name, US Postal Address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows® 2000, Windows® XP, Windows Vista®; Mac OS® X |
| --- | --- |
| Browsers: | Final release versions of Internet Explorer® 6.0 or above (Windows only); Mozilla Firefox 2.0 or above (Windows and Mac); Safari™ 3.0 or above (Mac only) |
| PDF Reader: | Acrobat® or similar software may be required to view and print PDF files |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | Allow per session cookies |

** These minimum requirements are subject to change. If these requirements change, you will be asked to re-accept the disclosure. Pre-release (e.g. beta) versions of operating systems and browsers are not supported.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to

other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify DocuSign, Inc. as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  DocuSign, Inc. during the course of my relationship with you.

# EXHIBIT 4

DocuSign Envelope ID: D0A364E0-0103-45AF-99D7-D2B956B36B7E

# DOCUSIGN CODE OF CONDUCT

DocuSign Envelope ID: D0A364E0-0103-45AF-99D7-D2B956B36B7E

To build trust and confidence in our company, our people, our product, we must demonstrate integrity, reliability, honesty and strength of character at all times.

We must always act in the best interests of DocuSign, our stockholders and our customers. We must respect our fellow employees, foster long-term partnerships with our customers and partners, and act responsibly in our communities.

The DocuSign Code of Conduct (the "Code") sets forth the fundamental principles and some of the key policies and procedures that govern DocuSign's business. Our officers, directors and employees – each of us – here at DocuSign should know and comply with all company guidelines, codes and policies.

## OUR RESPONSIBILITIES TO EACH OTHER

### Protecting Confidential Information and Intellectual Property

One of our most valuable assets is our confidential information: information about what we create; information about our business plans and strategies; information about our people and organizations; and information about our corporate finances. To safeguard our position in the market we must not only safeguard this proprietary information, but thoughtfully decide when to release that information.

Each of us must know and follow Docusign's Information Security and Acceptable Use Policies. We keep documents, e-mails, and other information confidential and only disseminate it outside of DocuSign when required for business reasons. Except for authorized DocuSign spokespersons, employees should not communicate confidential information with the press or in public forums about DocuSign. If you are unsure whether information may be disclosed, ask your manager or seek advice from the Legal Department.

We respect the privacy of our customers, employees, business partners and other relevant individuals, and we protect their personally identifiable information from unauthorized disclosure or abuse.

### Avoiding Conflicts of Interest

We have a duty to our stockholders to always act for the corporate good and not for personal benefit. It means avoiding situations that create, or appear to create, a conflict between personal gain and DocuSign's interest. If such conflicts of interest arise, we must immediately remove ourselves from any decision-making in the matter and let others decide on behalf of DocuSign.

Potential conflicts include, but are not limited to, personnel decisions regarding fellow employees or vendors with whom you may have a personal or romantic relationship and situations where your or your family members have a significant financial stake or employment relationship with organizations seeking to do business or competing with DocuSign. Employment by, significant gifts from, or serving on the board of a customer, partner or other service provider is generally discouraged and you

must seek authorization from the Legal Department by completing an Outside Activity Disclosure Form if you intend to take such a position.

### Promoting Diversity

DocuSign is a global corporation with a talented and passionate workforce comprising people from all walks of life. We are a creative and innovative company and the diverse backgrounds and experiences of our employees are among our greatest corporate strengths. Creativity and innovation flourish in environments of openness and mutual respect. Excluding or limiting a person because of some arbitrary factor would only limit our corporate potential and make us more vulnerable to our competition. At DocuSign, we treat each individual fairly. We do not tolerate discrimination against any individual on the basis of any non-performance-related characteristic. These characteristics include race, religion, gender, age, marital status, national origin, sexual orientation, citizenship status, disability, and other protected characteristics. We do not consider these factors when making decisions regarding recruiting, hiring, compensation, benefits, training, termination, promotions, or any other condition of employment or career development. This policy of non-discrimination is not limited to employees and potential employees, but extends to how we treat our partners, investors, customers, and fellow community members as well.

### Treating Each Other with Respect

Our performance is directly impacted by how we are treated as individuals. We cannot generate the passion or creativity DocuSign needs to compete unless we create an environment that fosters respect and where every employee and partner is treated as a valued contributor.

We treat each individual with respect and strive to create a work environment where all feel welcome to contribute. We do not tolerate any actions, words, or gestures that might be perceived as abusive or harmful to others or that create or foster an offensive or hostile work environment, including, but not limited to, offensive conduct, derogatory jokes or comments, or unwanted sexual advances. This standard applies to our relations with customers, partners, coworkers, and fellow community members around the world.



## OUR RESPONSIBILITY TO OUR CUSTOMERS AND PARTNERS

### Fostering Partnerships

DocuSign's success is dependent on our developing long-term partnerships with the customers and companies with whom we do business. We enter into partnerships committed to promoting our partners' interests as well as our own. We never sacrifice a long-term relationship for a short term gain and we never take undue advantage of a business relationship.

### Respecting the Intellectual Property of Others

As a technology company, we recognize that our lifeblood is intellectual property: patents, copyrights, trade secrets, and trademarks. If we want others to respect our intellectual property, we must do the same in return. We respect the intellectual property of others.

When we use patents and copyrighted material belonging to others, we obtain the proper licenses and permissions. When we cite the trademarks of others, we use them in accordance with any applicable license or permission provided by the owners. We do not use DocuSign networks, computers, or other resources to acquire, share, or store copyrighted material that is not properly licensed.

### Maintaining Nondisclosure

Just as we keep our own proprietary information confidential, we must also treat as confidential the proprietary information of those we do business with. We maintain the proprietary information of our business partners with the same protection we devote to our own. We do not publicly disclose such information without the express permission of the owner.

### Giving and Accepting Gifts

Maintenance of long-term relationships requires that we act in a way that does not create conflicts of interest or ethical concerns for our partners.

We at DocuSign never place a partner, customer, or government official in an ethically challenging position. With that in mind, we do not offer gifts to government officials.

Gifts, entertainment, and hospitality are permitted for non-government partners or customers only if they:
• have a business purpose

• are reasonable in value and appropriate to the business relationship and local custom
• are not intended to improperly influence acts or decisions
• are legal in both your country and the country of the recipient
• do not violate the standards of conduct of the recipient's organization or any contractual agreement with a customer
• are properly documented and
• where necessary, proper approval is obtained prior to giving any gift, entertainment, or hospitality. If you have a question about whether a gift or entertainment is permissible, seek advice from DocuSign's Legal Team or you can email complianceofficer@docusign.com.

## OUR RESPONSIBILITY TO THE COMMUNITY

### Securing Competitive Information

Free and open markets serve all in the community and only serve to make us and our products better over the long run. At DocuSign, we do not engage in activities that would limit competition in the marketplace or which might violate antitrust laws. We gather competitive information with care, seeking only information that is publicly available. We conduct all our internal discussions, deliberations, and activities as if they were completely in the public view.

### Corruption and Bribery

We strictly forbid offering or giving to any person, or soliciting or accepting from any person, bribes, preferential benefits and kickbacks by our employees, directors, contractors, and business partners. We abide by anti-corruption laws everywhere we do business in the world, without exception. These laws include the U.S. Foreign Corrupt Practices Act and the UK Bribery Act 2010, which apply everywhere we do business globally, as well as all applicable anti-corruption laws in each country where we do business. Broadly speaking, anti-corruption laws prohibit offering or giving, or requesting or accepting, anything of value (including cash, gifts, entertainment, travel expenses, and anything else that has a value to the recipient) to or from a government official or any person in order to influence anyone in the performance of their job to retain or obtain business or any improper business advantage. Each of us, regardless of the country in which

DocuSign Envelope ID: D0A364E0-0103-45AF-99D7-D2B956B36B7E



we work, must adhere to these requirements, even where corrupt practices are expected or customary.

### Improving our Communities

Our success is due in large part to the benefits, both tangible and intangible, we derive from membership in larger communities, local, national, and global. We seek to return these benefits, both as a corporate entity and by encouraging employees to take an active part in their communities. We are committed to benefiting the communities in which we live and work. As a corporation we work with and contribute to charitable and community organizations. We encourage employees to become individually engaged in community organizations, charities, and political activities as their conscience and desires dictate.

### Conserving the Environment

We are dedicated to conducting all our activities in an environmentally responsible way that minimizes environmental impacts. We actively promote the use of environmentally friendly products and services, recycling and reuse of resources. We maintain a safe and healthy work environment and our activities are undertaken in full compliance with applicable environmental legislation and regulations.

### Engaging in Political Activities

We encourage employees to participate in the political process, however, we do not use DocuSign funds or assets on behalf of a political party or candidate except as expressly approved by DocuSign. Employees may involve themselves in political issues and campaigns as their consciences and beliefs dictate, but such involvement must be on an individual basis without using DocuSign resources and on their own time.

## REPORTING VIOLATIONS

It is impossible to spell out every possible ethical scenario we might face, so we rely on one another's good judgment to uphold and apply this Code. We expect all of us at DocuSign to be guided by both the letter and the spirit of this Code. Often this will mean making judgment calls about situations. When it comes to ethical conduct, we believe in erring on the side of caution. Such judgments may not always be an easy call, so if you are not sure of what to do, ask your supervisor or Reggie Davis, our Chief Compliance Officer at complianceofficer@docusign.com.

We have also established an anonymous reporting tool in accordance with local law. Employees may make anonymous reports by: (i) leaving an anonymous message via toll-free telephone at 855-857-6207; (ii) submitting an anonymous report online at www.docusign.ethicspoint.com; (iii) sending a message from an anonymous email address to complianceofficer@docusign.com; or (iv) delivering the complaint anonymously via regular mail to the Chief Compliance Officer at DocuSign, Inc., 221 Main Street, Suite 1000, San Francisco, California, 94105, USA.

More information and details about specific DocuSign policies are available on **myDocuSign**. If you have questions about specifics, this should be the first place you turn. If you know of a situation or incident that you feel may violate this Code, it is your responsibility to bring it to the attention of your supervisor or the Chief Compliance Officer.

The issue will be reviewed and appropriate action taken to correct the situation and ensure further violations do not occur. Failure of any employee to live up to the Code, will result in disciplinary action, up to and including termination of employment. Do not be afraid to speak out. We will not retaliate or allow retaliation for reports made in good faith.

### Complying with Applicable Laws

We obey and comply with all laws and regulations that apply to us in the communities in which DocuSign does business. But this legal compliance is simply the baseline, establishing the minimum that we must do. We always comport ourselves in accordance with the highest ethical standards, and the principles of this Code, whether or not there is a legal requirement to do so. In addition to adhering to local regulations, we always comply with the US Foreign Corrupt Practices Act and US export control regulations regardless of the country in which we are operating.

DocuSign Envelope ID: D0A364E0-0103-45AF-99D7-D2B956B36B7E



DocuSign Envelope ID: D0A364E0-0103-45AF-99D7-D2B956B36B7E



**CODE OF CONDUCT ACKNOWLEDGMENT**

I hereby confirm receipt of DocuSign's Code of Conduct. I further acknowledge that I have read and agree to abide by the terms the Code of Conduct in its entirety during the course of my employment by DocuSign and/or its affiliates.

I understand that DocuSign can modify the Code of Conduct at any time, in its sole discretion, with or without prior notice. I further understand that nothing in the Code of Conduct alters the at-will relationship between me and DocuSign and/or its affiliates.

DocuSigned by:

Signature                                                    August 13, 2017
                                                             Date

Chris Young

Print Name



## Certificate Of Completion

Envelope Id: D0A364E0010345AF99D7D2B956B36B7E                    Status: Completed
Subject: Code of Conduct Acknowledgment - Chris Young
EnvelopeType:
Source Envelope:
Document Pages: 6                    Signatures: 1                    Envelope Originator:
Supplemental Document Pages: 0      Initials: 0                      DocuSign HR
Certificate Pages: 4
AutoNav: Enabled                    Payments: 0                      221 Main Street
EnvelopeId Stamping: Enabled                                        Suite 1000
Time Zone: (UTC-08:00) Pacific Time (US &                           San Francisco, CA  94105
Canada)                                                             hr@docusign.com
                                                                    IP Address: 12.202.171.34

## Record Tracking

Status: Original                    Holder: DocuSign HR             Location: DocuSign
        8/7/2017 8:49:13 AM                 hr@docusign.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Chris Young<br>Chris.Young@docusign.com<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>22B9EA7C133F431... | Sent: 8/7/2017 8:49:15 AM<br>Viewed: 8/13/2017 1:59:52 PM<br>Signed: 8/13/2017 2:00:08 PM |
| | Using IP Address: 50.106.16.2<br>Signed using mobile | |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 8/13/2017 1:59:52 PM<br>    ID: 92846717-6df7-4af9-8979-44b1a06add70 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 8/7/2017 8:49:16 AM |
| Certified Delivered | Security Checked | 8/13/2017 1:59:52 PM |
| Signing Complete | Security Checked | 8/13/2017 2:00:09 PM |
| Completed | Security Checked | 8/13/2017 2:00:09 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

### Electronic Record and Signature Disclosure

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, DocuSign, Inc. (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign, Inc. (DocuSign) electronic signing system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after signing session and, if you elect to create a DocuSign signer account, you may access them for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of a DocuSign envelope instead of signing it. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures

electronically from us.

**How to contact DocuSign, Inc.:**
You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

**To advise DocuSign, Inc. of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at owen.quennell@docusign.com and in the body of such request you must state: your previous e-mail address, your new e-mail address.  We do not require any other information from you to change your email address..
In addition, you must notify DocuSign, Inc. to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in the DocuSign system.

**To request paper copies from DocuSign, Inc.**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to owen.quennell@docusign.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with DocuSign, Inc.**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
> ii. send us an e-mail to owen.quennell@docusign.com and in the body of such request you must state your e-mail, full name, US Postal Address, and telephone number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows® 2000, Windows® XP, Windows Vista®; Mac OS® X |
|---|---|
| Browsers: | Final release versions of Internet Explorer® 6.0 or above (Windows only); Mozilla Firefox 2.0 or above (Windows and Mac); Safari™ 3.0 or above (Mac only) |
| PDF Reader: | Acrobat® or similar software may be required to view and print PDF files |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | Allow per session cookies |

** These minimum requirements are subject to change. If these requirements change, you will be asked to re-accept the disclosure. Pre-release (e.g. beta) versions of operating systems and browsers are not supported.

**Acknowledging your access and consent to receive materials electronically**
To confirm to us that you can access this information electronically, which will be similar to

other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify DocuSign, Inc. as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  DocuSign, Inc. during the course of my relationship with you.

# EXHIBIT 5

# DOCUSIGN, INC.
## RESTRICTED STOCK UNIT GRANT NOTICE
### (AMENDED AND RESTATED 2011 EQUITY INCENTIVE PLAN)

DocuSign, Inc. (the "**Company**"), pursuant to its Amended and Restated 2011 Equity Incentive Plan (the "**Plan**"), hereby awards to Participant (as of the date indicated below) a Restricted Stock Unit Award for the number of shares of the Company's Common Stock set forth below (the "**Award**"). The Award is subject to all of the terms and conditions as set forth herein and in the Plan and the Restricted Stock Unit Award Agreement, both of which are attached hereto and incorporated herein in their entirety. Capitalized terms not otherwise defined herein will have the meanings set forth in the Plan or the Restricted Stock Unit Award Agreement. In the event of any conflict between the terms in the Award and the Plan, the terms of the Plan will control.

| | |
|---|---|
| Participant: | CHRIS YOUNG |
| Date of Grant: | September 14, 2017 |
| Vesting Commencement Date: | August 10, 2017 |
| Liquidity Event Deadline[(1)]: | March 14, 2024 |
| Number of Units (**RSUs**) Subject to Award: | 14,100 |

**Expiration Date:** The Expiration Date for an RSU depends on whether the Service-Based Requirement has been satisfied with respect to that particular RSU. Where the Service-Based Requirement for a particular RSU has not been satisfied, the Expiration Date is the earlier of: (i) Liquidity Event Deadline or (ii) the date of termination of Participant's status as a Service Provider. Where the Service-Based Requirement for a particular RSU has been satisfied in whole or in part, the Expiration Date is the Liquidity Event Deadline.

**Vesting:** Participant will receive a benefit with respect to an RSU only if it vests. Except as explicitly set forth below, two vesting requirements must be satisfied on or before the applicable Expiration Date specified above in order for an RSU to vest — a time and service-based requirement (the "**Service-Based Requirement**") and the "**Liquidity Event Requirement**" (described below). An RSU shall actually vest (and therefore becomes a "**Vested RSU**") on the first date upon which both the Service-Based Requirement and the Liquidity Event Requirement are satisfied with respect to that particular RSU (the "**Vesting Date**"). All RSUs that do not become Vested RSUs on or before the applicable Expiration Date will be immediately forfeited to the Company upon expiration at no cost to the Company.

**Liquidity Event Requirement:** The Liquidity Event Requirement will be satisfied as to any then-outstanding RSUs on the first to occur of: (1) a Change in Control; and (2) the effective date of a registration statement of the Company filed under the Securities Act of 1933, as amended (the "**Securities Act**") for the sale of the Company's Common Stock (an "**IPO**"). Section 2 of the Restricted Stock Unit Agreement contains additional details on the definition of Change in Control.

[(1)] Note: Will be 6 years and 6 months after Date of Grant.

**Service-Based Requirement:** The Service-Based Requirement will be satisfied in installments as follows: 25% of the total number RSUs awarded will have the Service-Based Requirement satisfied on the 12-month anniversary of the Vesting Commencement Date, and thereafter $1/16^{th}$ of the total number of RSUs awarded will have the Service-Based Requirement satisfied in a series of 12 successive equal quarterly installments following the first anniversary of the Vesting Commencement Date until the Service-Based Requirement is fully satisfied on

the fourth anniversary of the Vesting Commencement Date, in each case subject to the Participant continuing to be a Service Provider as of such date. For the avoidance of doubt and except as provided in the preceding sentence, once a Participant ceases to be a Service Provider, no additional RSUs will be deemed to have the Service-Based Requirement satisfied with respect to such RSUs.

**Settlement Time:** If an RSU vests as provided for above, the Company will deliver one share of Common Stock for each Vested RSU in accordance with the following schedule (each such date or event below, a "***Settlement Time***").

(i) If the Liquidity Event Requirement occurred because of a Change in Control, then the Settlement Time for then Vested RSUs shall occur as of immediately before the Change in Control.

(ii) If the Liquidity Event Vesting occurred because of an IPO, then the Settlement Time for Vested RSUs shall occur upon the later of (1) the next Quarterly Settlement Date (or the first business day thereafter if such Quarterly Settlement Date does not fall on a business day) that immediately follows the vesting date for such Vested RSUs or (2) the IPO Settlement Date (or the first business day thereafter if such IPO Settlement Date does not fall on a business day). Notwithstanding the foregoing provisions of this clause (ii), if a Change in Control occurs after the IPO then the Settlement Time for Vested RSUs shall occur as specified in clause (i) above.

"***IPO Settlement Date***" means the third Quarterly Settlement Date that follows an IPO.

"***Quarterly Settlement Dates***" means March 15, June 15, September 15 and December 15.

The shares will also be issued in accordance with the issuance schedule set forth in Section 5 of the Restricted Stock Unit Award Agreement.

**Additional Terms/Acknowledgements:** Participant acknowledges receipt of, and understands and agrees to, this Restricted Stock Unit Grant Notice, the Restricted Stock Unit Award Agreement and the Plan. Participant further acknowledges that as of the Date of Grant, this Restricted Stock Unit Grant Notice, the Restricted Stock Unit Award Agreement and the Plan set forth the entire understanding between Participant and the Company regarding this Award and supersede all prior oral and written agreements, offer letters, promises and/or representations on that subject with the exception of (i) equity awards previously granted and delivered to Participant, (ii) any compensation recovery policy that is adopted by the Company or is otherwise required by applicable law and (iii) any written employment or severance arrangement that would provide for vesting acceleration (but not payment acceleration) of this award upon the terms and conditions set forth therein (provided that if there is any conflict in the vesting and/or acceleration terms, those contained in this Restricted Stock Unit Grant Notice and Restricted Stock Unit Award Agreement shall control).

By accepting the Award, Participant acknowledges having received and read the Restricted Stock Unit Grant Notice, the Restricted Stock Unit Award Agreement and the Plan (the "***Grant Documents***") and agrees to all of the terms and conditions set forth in these documents. Furthermore, by accepting the Award, Participant consents to receive such documents by electronic delivery and to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company.

Notwithstanding the above, if Participant has not actively accepted the Award within 90 days of the Date of Grant set forth in this Restricted Stock Unit Grant Notice, Participant is deemed to have accepted the Award, subject to all of the terms and conditions of the Grant Documents.

**DocuSign, Inc.**                                          **Participant:**

By:_____     _____
                                              Signature
                  Signature
      Title:   General Counsel


**ATTACHMENTS**:   Restricted Stock Unit Award Agreement, Amended and Restated 2011 Equity Incentive Plan


### ATTACHMENT I

# DOCUSIGN, INC.
## RESTRICTED STOCK UNIT AWARD AGREEMENT
## (AMENDED AND RESTATED 2011 EQUITY INCENTIVE PLAN)

Pursuant to the Restricted Stock Unit Grant Notice (the "***Grant Notice***") and this Restricted Stock Unit Award Agreement (the "***Agreement***") and in consideration of your services, DocuSign, Inc. (the "***Company***") has awarded you a Restricted Stock Unit Award (the "***Award***") under its Amended and Restated 2011 Equity Incentive Plan (the "***Plan***"). The Award is granted to you effective as of the Date of Grant set forth in the Grant Notice for this Award.  Capitalized terms not explicitly defined in this Agreement will have the same meanings given to them in the Plan.  In the event of any conflict between the terms in this Agreement and the Plan, the terms of the Plan will control.  The details of the Award, in addition to those set forth in the Grant Notice and the Plan, are as follows.

**1.     GRANT OF THE AWARD.**  The Award represents the right to be issued on a future date the number of shares of the Company's Common Stock as indicated in the Grant Notice upon the satisfaction of the terms set forth in this Agreement.  Except as otherwise provided herein, you will not be required to make any payment to the Company with respect to your receipt of the Award, the vesting of the shares or the delivery of the underlying Common Stock.

**2.     VESTING.**  Subject to the limitations contained herein, the Award will vest, if at all, in accordance with the vesting schedule provided in the Grant Notice, provided that vesting will cease upon the termination of your status as a Service Provider.  Upon such termination of your status as a Service Provider, the shares subject to the Award that were not vested on the date of such termination will be forfeited at no cost to the Company and you will have no further right, title or interest in or to such underlying shares of Common Stock.  For purposes of determining whether the Liquidity Event Requirement has been satisfied, a Change in Control has the same meaning as in the Plan, except that a transaction or event will not constitute a Change in Control unless the transaction or event qualifies as a change in control event within the meaning of Code Section 409A.

**3.     NUMBER OF SHARES.**

**(a)**     The number of units/shares subject to the Award may be adjusted from time to time for capitalization adjustments as provided in Section 13(a) of the Plan (a "***Capitalization Adjustment***").

**(b)**     Any units, shares, cash or other property that become subject to the Award pursuant to this Section 3 if any, will be subject, in a manner determined by the Board, to the same forfeiture restrictions, restrictions on transferability, and time and manner of delivery as applicable to the other shares covered by the Award.

**(c)**     Notwithstanding the provisions of this Section 3, no fractional shares or rights for fractional shares of Common Stock will be created pursuant to this Section 3.  The Board will, in its discretion,

determine an equivalent benefit for any fractional shares or fractional shares that might be created by the adjustments referred to in this Section 3.

4. **SECURITIES LAW AND OTHER COMPLIANCE.** You may not be issued any shares under the Award unless either (a) the shares are registered under the Securities Act; or (b) the Company has determined that such issuance would be exempt from the registration requirements of the Securities Act. The Award also must comply with other Applicable Laws governing the Award, and you will not receive such shares if the Company determines that such receipt would not be in material compliance with such laws and regulations.

5. **DATE OF ISSUANCE.** Subject to the satisfaction of the withholding obligations set forth in Section 14 of this Agreement, the Company will deliver to you a number of shares of the Company's Common Stock equal to the number of Vested RSUs subject to the Award, including any additional shares received pursuant to Section 3 above that relate to those Vested RSUs on the applicable Settlement Time(s) as provided in the Grant Notice. However, if a scheduled delivery date falls on a date that is not a business day, such delivery date will instead fall on the next following business day. The form of such delivery (*e.g.*, a stock certificate or electronic entry evidencing such shares) will be determined by the Company.

6. **DIVIDENDS.** You will receive no benefit or adjustment to your Restricted Stock Units with respect to any cash dividend, stock dividend or other distribution except as provided in the Plan with respect to a Capitalization Adjustment.

7. **MARKET STAND-OFF AGREEMENT.** By acquiring shares of Common Stock under your Award, you agree that you will not sell, dispose of, transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, any shares of Common Stock or other securities of the Company held by you, for a period of 180 days following the effective date of a registration statement of the Company filed under the Securities Act or such longer period as the underwriters or the Company request or as necessary to permit compliance with FINRA Rule 2711 or NYSE Member Rule 472 and similar or successor regulatory rules and regulations (the "***Lock-Up Period***"); *provided, however*, that nothing contained in this Section 7 will prevent the exercise of a repurchase option, if any, in favor of the Company during the Lock-Up Period. You further agree to execute and deliver such other agreements as may be reasonably requested by the Company and the underwriters that are consistent with the foregoing or that are necessary to give further effect thereto. You also agree that any transferee of any shares of Common Stock (or other securities of the Company held by you will be bound by this Section 7. To enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to your shares of Common Stock until the end of such period. The underwriters of the Company's stock are intended third party beneficiaries of this Section 7 and will have the right, power and authority to enforce the provisions of this Section 7 as though they were a party to this Agreement.

8. **TRANSFER RESTRICTIONS.** In addition to any other limitation on transfer created by Applicable Laws and the restrictions in Section 12, as applicable, you will not sell, assign, hypothecate, donate, encumber or otherwise dispose of all or any part of the shares subject to your Award or any interest in such shares except in compliance with this Agreement (including without limitation Sections 9 and 10), the Company's bylaws and applicable securities laws.

9. **RIGHT OF FIRST REFUSAL.** The shares of Common Stock issued to you pursuant to your Award are subject to any right of first refusal that may be described in the Company's bylaws in effect at such time the Company elects to exercise its right. The Company's right of first refusal shall expire on the first date upon which any security of the Company is listed (or approved for listing) upon notice of issuance on a national securities exchange or quotation system.

10. **RESTRICTIVE LEGENDS.** All certificates representing the Common Stock issued under this Agreement will be endorsed with legends in substantially the following forms (in addition to any other legend that may be required by other agreements between you and the Company):

(a)         "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS AND CONDITIONS SET FORTH IN A RESTRICTED STOCK UNIT AWARD AGREEMENT BETWEEN THE COMPANY AND THE REGISTERED HOLDER, OR SUCH HOLDER'S PREDECESSOR IN INTEREST, A COPY OF WHICH IS ON FILE AT THE COMPANY'S PRINCIPAL CORPORATE OFFICES. ANY TRANSFER OR ATTEMPTED TRANSFER OF ANY SHARES IN VIOLATION OF SUCH RESTRICTIONS IS VOID WITHOUT THE PRIOR EXPRESS WRITTEN CONSENT OF THE COMPANY."

(b)         "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED."

(c)         "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A TRANSFER RESTRICTION, AS PROVIDED IN THE BYLAWS OF THE COMPANY."

(d)         "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A RIGHT OF FIRST REFUSAL OPTION IN FAVOR OF THE COMPANY AND/OR ITS ASSIGNEE(S), AS PROVIDED IN THE BYLAWS OF THE COMPANY."

(e)         Any legend required by appropriate blue sky officials.

11.      **Award not an Employment or Service Contract.**

(a)         Your continued service with the Company or an affiliate of the Company as a Service Provider is not for any specified term and may be terminated by you or by the Company or an affiliate at any time, for any reason, with or without cause and with or without notice.  Nothing in this Agreement (including, but not limited to, the vesting of the Award pursuant to Section 2 or the issuance of the shares subject to the Award), the Plan or any covenant of good faith and fair dealing that may be found implicit in this Agreement or the Plan will: (i) confer upon you any right to continue in the employ of, or affiliation with, the Company or an Affiliate; (ii) constitute any promise or commitment by the Company or an Affiliate regarding the fact or nature of future positions, future work assignments, future compensation or any other term or condition of employment or affiliation; (iii) confer any right or benefit under this Agreement or the Plan unless such right or benefit has specifically accrued under the terms of this Agreement or Plan; or (iv) deprive the Company or an affiliate of the right to terminate you at will and without regard to any future vesting opportunity that you may have.

(b)         By accepting this Award, you acknowledge and agree that the right to continue vesting in the Award pursuant to Section 2 and the schedule set forth in the Grant Notice is earned only by continuing as an Employee, Director or Consultant at the will of the Company or an affiliate (not through the act of being hired, being granted this Award or any other award or benefit) and that the Company has the right to reorganize, sell, spin-out or otherwise restructure one or more of its businesses or affiliates at any time or from time to time, as it deems appropriate (a "***reorganization***").  You further acknowledge and agree that such reorganization could result in the termination of your status as a Service Provider, or the termination of affiliate status of your employer (if different than the Company) (the "***Employer***"), and the loss of benefits available to you under this Agreement, including but not limited to, the termination of the right to continue vesting in the Award.  You further acknowledge and agree that this Agreement, the Plan, the transactions contemplated hereunder and the vesting schedule set forth in the Grant Notice or any covenant of good faith and fair dealing that may be found implicit in any of them do not constitute an express or implied promise of continued engagement as an Employee or Consultant with the Company or an affiliate of the Company for the term of this Agreement, for any period, or at all, and will not interfere in any way with your right or the right of the Company or your Employer to terminate your Service Provider status at any time, with or without cause and with or without notice.

12.      **Responsibility for Taxes.**

**(a)**        You acknowledge that, regardless of any action taken by the Company, the ultimate liability for all income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to your participation in the Plan and legally applicable to you or deemed by the Company in its discretion to be an appropriate charge to you even if legally applicable to the Company ("***Tax-Related Items***") is and remains your responsibility and may exceed the amount actually withheld by the Company.

**(b)**        Prior to any relevant taxable or tax withholding event, as applicable, you agree to make adequate arrangements satisfactory to the Company and/or the Employer to satisfy all Tax-Related Items.  In this regard, you authorize the Company or its agent to satisfy their withholding obligations with regard to all Tax-Related Items, if any, by any of the following means or by a combination of such means: (i) withholding from any compensation otherwise payable to you by the Company or the Employer; (ii) causing you to tender a cash payment; (iii) entering on your behalf (pursuant to this authorization without further consent) into a "same day sale" commitment with a broker dealer that is a member of the Financial Industry Regulatory Authority (a "***FINRA Dealer***") whereby you irrevocably elect to sell a portion of the shares to be delivered under the Award to satisfy the Tax-Related Items and whereby the FINRA Dealer irrevocably commits to forward the proceeds necessary to satisfy the Tax-Related Items directly to the Company and/or its Affiliates; or (iv) withholding shares of Common Stock from the shares of Common Stock issued or otherwise issuable to you in connection with the Award with a Fair Market Value (measured as of the date shares of Common Stock are issued to you or, if and as determined by the Company, the date on which the Tax-Related Items are required to be calculated) equal to the amount of such Tax-Related Items.        Depending on the withholding method employed, the Company may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding rates or other applicable withholding rates, including maximum applicable rates, in which case you will receive a refund of any over-withheld amount in cash and will have no entitlement to the Common Stock equivalent.  If the obligation for Tax-Related Items is satisfied by withholding in shares of Common Stock, for tax purposes, you are deemed to have been issued the full number of shares of Common Stock subject to the vested portion of the Award, notwithstanding that a number of the shares of Common Stock are held back solely for the purpose of paying the Tax-Related Items.

**(c)**        Finally, you agree to pay to the Company or the Employer any amount of Tax-Related Items that the Company or the Employer may be required to withhold or account for as a result of your participation in the Plan that cannot be satisfied by any of the means previously described.  Notwithstanding any contrary provision of the Plan, the Notice of Grant or of this Agreement, if you fail to make satisfactory arrangements for the payment of any Tax-Related Items when due, you permanently will forfeit the Restricted Stock Units on which the Tax-Related Items were not satisfied and will also permanently forfeit any right to receive shares of Common Stock thereunder. In that case, the Restricted Stock Units will be returned to the Company at no cost to the Company.

**13.**        **INVESTMENT REPRESENTATIONS.** In connection with your acquisition of the Common Stock under your Award, you represent to the Company the following:

**(a)**        You are aware of the Company's business affairs and financial condition and have acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Common Stock. You are acquiring the Common Stock for investment for your own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act.

**(b)**        You understand that the Common Stock has not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of your investment intent as expressed in this Agreement.

**(c)**        You further acknowledge and understand that the Common Stock must be held indefinitely unless the Common Stock is subsequently registered under the Securities Act or an exemption from such registration is available. You further acknowledge and understand that the Company is under no obligation to register the Common Stock. You understand that the certificate evidencing the Common Stock will be

imprinted with a legend that prohibits the transfer of the Common Stock unless the Common Stock is registered or such registration is not required in the opinion of counsel for the Company.

(d)     You are familiar with the provisions of Rules 144 and 701 under the Securities Act, as in effect from time to time, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer thereof (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions. Rule 701 provides that if the issuer qualifies under Rule 701 at the time of issuance of the securities, such issuance will be exempt from registration under the Securities Act. In the event the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act of 1934, as amended, the securities exempt under Rule 701 may be sold by you 90 days thereafter, subject to the satisfaction of certain of the conditions specified by Rule 144 and the market stand-off agreement described in Section 7.

(e)     In the event that the sale of the Common Stock does not qualify under Rule 701 at the time of issuance, then the Common Stock may be resold by you in certain limited circumstances subject to the provisions of Rule 144, which requires, among other things: (i) the availability of certain public information about the Company; and (ii) the resale occurring following the required holding period under Rule 144 after you have purchased, and made full payment of (within the meaning of Rule 144), the securities to be sold.

(f)     You further understand that at the time you wish to sell the Common Stock there may be no public market upon which to make such a sale, and that, even if such a public market then exists, the Company may not be satisfying the current public current information requirements of Rule 144 or 701, and that, in such event, you would be precluded from selling the Common Stock under Rule 144 or 701 even if the minimum holding period requirement had been satisfied.

**14.     NO OBLIGATION TO MINIMIZE TAXES.**  You acknowledge that the Company is not making representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Award, including, but not limited to, the grant, vesting or settlement of the Award, the subsequent sale of shares of Common Stock acquired pursuant to such settlement and the receipt of any dividends and/or any dividend equivalent payments.   Further, you acknowledge that the Company does not have any duty or obligation to minimize your liability for Tax-Related Items arising from the Award and will not be liable to you for any Tax-Related Items arising in connection with the Award.

**15.     NO ADVICE REGARDING GRANT.**  The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding your participation in the Plan, or your acquisition or sale of the underlying shares of Common Stock.  You are hereby advised to consult with your own personal tax, financial and/or legal advisors regarding the Tax-Related Items arising in connection with the Award and by accepting the Award, you have agreed that you have done so or knowingly and voluntarily declined to do so.

**16.     UNSECURED OBLIGATION.**  The Award is unfunded, and as a holder of a vested Award, you will be considered an unsecured creditor of the Company with respect to the Company's obligation, if any, to issue shares pursuant to this Agreement.  You will not have voting or any other rights as a stockholder of the Company with respect to the shares to be issued pursuant to this Agreement until such shares are issued to you pursuant to Section 6 of this Agreement.   Upon such issuance, you will obtain full voting and other rights as a stockholder of the Company.   Nothing contained in this Agreement, and no action taken pursuant to its provisions, will create or be construed to create a trust of any kind or a fiduciary relationship between you and the Company or any other person.

**17.     NOTICES.**  Any notices provided for in the Grant Notice, this Agreement or the Plan will be given in writing and will be deemed effectively given upon receipt or, in the case of notices delivered by the Company to you, five (5) days after deposit in the United States mail, postage prepaid, addressed to you at the last address you provided to the Company.  Notwithstanding the foregoing, the Company may, in its sole discretion, decide to deliver any documents related to participation in the Plan and this Award by electronic means or to request your consent to participate in the Plan by electronic means.  You hereby consent to receive such documents by

electronic delivery and, if requested, to agree to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company.

**18.   MISCELLANEOUS.**

**(a)**      As a condition to the grant of your Award or to the Company's issuance of any shares of Common Stock under this Agreement, the Company may require you to execute certain customary agreements entered into with the holders of capital stock of the Company, including without limitation a stockholders agreement.

**(b)**      The rights and obligations of the Company under the Award will be transferable to any one or more persons or entities, and all covenants and agreements hereunder will inure to the benefit of, and be enforceable by the Company's successors and assigns. Your rights and obligations under the Award may only be assigned with the prior written consent of the Company.

**(c)**      You agree upon request to execute any further documents or instruments necessary or desirable in the sole determination of the Company to carry out the purposes or intent of the Award.

**(d)**      You acknowledge and agree that you have reviewed the documents provided to you in relation to the Award in their entirety, have had an opportunity to obtain the advice of counsel prior to executing and accepting the Award, and fully understand all provisions of such documents.

**(e)**      This Agreement will be subject to all applicable laws, rules, and regulations, and to such approvals by any governmental agencies or national securities exchanges as may be required.

**(f)**      All obligations of the Company under the Plan and this Agreement will be binding on any successor to the Company, whether the existence of such successor is the result of a direct or indirect purchase, merger, consolidation, or otherwise, of all or substantially all of the business and/or assets of the Company.

**19.   GOVERNING PLAN DOCUMENT.**   The Award is subject to all the provisions of the Plan, the provisions of which are hereby made a part of the Award, and is further subject to all interpretations, amendments, rules and regulations which may from time to time be promulgated and adopted pursuant to the Plan.  Except as expressly provided herein, in the event of any conflict between the provisions of the Award and those of the Plan, the provisions of the Plan will control.

**20.   SEVERABILITY.**   If all or any part of this Agreement or the Plan is declared by any court or governmental authority to be unlawful or invalid, such unlawfulness or invalidity will not invalidate any portion of this Agreement or the Plan not declared to be unlawful or invalid. Any Section of this Agreement (or part of such a Section) so declared to be unlawful or invalid will, if possible, be construed in a manner which will give effect to the terms of such Section or part of a Section to the fullest extent possible while remaining lawful and valid.

**21.   EFFECT ON OTHER EMPLOYEE BENEFIT PLANS.**   The value of the Award subject to this Agreement will not be included as compensation, earnings, salaries, or other similar terms used when calculating the Employee's benefits under any employee benefit plan sponsored by the Company or any Affiliate, except as such plan otherwise expressly provides. The Company expressly reserves its rights to amend, modify, or terminate any of the Company's or any Affiliate's employee benefit plans.

**22.   AMENDMENT.**   This Agreement may not be modified, amended or terminated except by an instrument in writing, signed by you and by a duly authorized representative of the Company. Notwithstanding the foregoing, this Agreement may be amended solely by the Board by a writing which specifically states that it is amending this Agreement, so long as a copy of such amendment is delivered to you, and provided that, except as otherwise expressly provided in the Plan, no amendment adversely affecting your rights hereunder may be made without your written consent. Without limiting the foregoing, the Board reserves the right to change, by written notice to you, the provisions of this Agreement in any way it may deem necessary or advisable to carry

out the purpose of the grant as a result of any change in applicable laws or regulations or any future law, regulation, ruling, or judicial decision, provided that any such change will be applicable only to rights relating to that portion of the Award which is then subject to restrictions as provided herein.

23.    COMPLIANCE WITH SECTION 409A OF THE CODE. Each installment of shares that vests is intended to constitute a "separate payment" for purposes of Treasury Regulation Section 1.409A-2(b)(2). If it is determined that all or a portion of the Award is deferred compensation subject to Section 409A of the Code, and if you are a "Specified Employee" (within the meaning set forth Section 409A(a)(2)(B)(i) of the Code) as of the date of your separation from service (within the meaning of Treasury Regulation Section 1.409A-1(h)), then the issuance of any shares that would otherwise be made upon the date of the separation from service or within the first six months thereafter will not be made on the originally scheduled date(s) and will instead be issued in a lump sum on the date that is six months and one day after the date of the separation from service, with the balance of the shares issued thereafter in accordance with the original vesting and issuance schedule set forth above, but if and only if such delay in the issuance of the shares is necessary to avoid the imposition of taxation on you in respect of the shares under Section 409A of the Code. Notwithstanding any contrary provision of the Plan, the Notice of Grant, or of this Agreement, under no circumstances will the Company reimburse you for any taxes or other costs under Section 409A of the Code or any other tax law or rule. All such taxes and costs are solely your responsibility.

*        *        *

This Agreement will be deemed to be signed by you upon the signing by you of the Restricted Stock Unit Grant Notice to which it is attached.

ATTACHMENT II

DOCUSIGN, INC.

AMENDED AND RESTATED 2011 EQUITY INCENTIVE PLAN

# EXHIBIT 6

| From: | Jason Gillis <jgillis@mercerlg.com> |
|---|---|
| Sent: | Monday, April 08, 2019 3:26 PM |
| To: | Jedreski, Matt; George Tamblyn |
| Cc: | Hess, Ryan |
| Subject: | RE: Young v. DocuSign - motion to dismiss |

[EXTERNAL]

Matt, thank you for the call Friday. We appreciate you taking the time to share Defendant's views. We respectfully disagree with each assertion in your April 5th e-mail, which we do not believe to fully and accurately reflect all facts. We do not believe that a 12(b)(6) motion would be appropriate, or successful, with respect to any of Plaintiff's claims. We will present Young's case in opposition should Defendant proceed as articulated. We look forward to a continued spirit of cooperation, where possible, as you advocate for your client in this matter.

*Coulombe* was not cited for the ultimate holding under the facts of that case. Young's facts are clearly differentiated from the facts that led to the Court finding Mr. Coulombe that had knowingly and voluntarily relinquished his options; *Coulombe* was referenced in support of the proposition that *stock options, as wages, may fall under RCW 49.52.050 in certain circumstances*. Absent the stock, Young's salary was inadequate. In 2017 DocuSign made verbal representations to Young about the future expected value of his stock options as of August 2018. *IBM v. Bajorek* addressed **stock options in the context of a California Statute that explicitly defined wages** as: "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." In *Coulombe* the court said the following about **the Washington Statute: "the statue does not defined the term 'wages', and the court is not aware of any Washington case to consider whether stock options are wages in the context of section .050**."

At the pleading stage Plaintiff is merely required to provide a short and plain statement of a claim showing that he is entitled to relief. Although Plaintiff is not required to plead detailed factual allegations, Plaintiff has provided enhanced factual allegations in his First Amended Complaint, which (taken as true) raise a right to relief above the speculative level. With regard to RCW 49.52.050, we believe that whether all, or a portion, of Young's stock options constitute wages – under his specific facts - for purposes of RCW 49.52.050, is a material and disputed question of fact that should be reserved for the jury. We believe that the attendant facts, including, but not limited to: 1) communication to induce employment – including communication from Defendant to Young related to the expected value of Young's Stock after one-year –, and 2) the totality of employment agreements - which include the Restricted Stock Unit Award Agreement providing stock to Young [as compensation for his labor] "in consideration of his services", among other factors, support Young's contention that at least a portion of his stock options were wages subject to RCW 49.52.050. Under Mr. Young's facts, we believe RCW 49.52.050 properly protects Young's reliance interest in his expected wages. Do you have specific legal authority to support your conclusion that "*unvested stock interest is not "a wage" under WA law*"? If you are inclined to forward such authority, we would promptly consider it with regard to the RCW 49.52.050 claim.

Sincerely,

**Jason Gillis**



**Mercer Island Law Group**
2448 76th Ave SE, Suite 100

Mercer Island, WA 98040
206-236-2769 Ext.100 (Phone)
206-236-1893 (Fax)
https://www.mercerlg.com/

NOTE: THIS IS A CONFIDENTIAL MESSAGE! If you are not the intended recipient, please delete and notify the sender that you received it in error. DO NOT DISTRIBUTE OR COPY THE MESSAGE. Thank you.
CLIENTS: If you have any reason to be concerned about the security of your email, please advise me so that we can take appropriate steps to keep our communications confidential.

**From:** Jedreski, Matt <mjedreski@dwt.com>
**Sent:** Friday, April 5, 2019 2:41 PM
**To:** Jason Gillis <jgillis@mercerlg.com>; George Tamblyn <gtamblyn@mercerlg.com>
**Cc:** Hess, Ryan <RyanHess@dwt.com>
**Subject:** Young v. DocuSign - motion to dismiss

Hi, Jason:

Thanks again for the phone call today. As I said, we still see fundamental deficiencies in the Amended Complaint and intend to move for dismissal next Thursday (our deadline to do so). I detailed the bases for our motion, which I said I'd also provide in writing (they are stated below), and asked that plaintiff consider whether he would voluntarily dismiss some or all of his claims. We agreed to touch base after you and George had a chance to review.

Here are the reasons why the Amended Complaint fails to state valid causes of action:

1. **Contract claims**
   - As before, the cited provisions in the DocuSign Code of Conduct are not enforceable contracts because they are aspirational employment policies giving rise to a promise of specific treatment in a specific situation applicable here
   - There is no explanation how DocuSign breached the RSU agreement
   - Plaintiff has not alleged how DocuSign's alleged breaches harmed him beyond his termination, so his claims appear to be an improper attempt to convert his at-will status
   - Plaintiff cannot add rights to the contracts through a breach of the covenant of good faith and fair dealing claim
2. **Misrepresentation claim**
   - The "misrepresentations" alleged from the Code of Conduct are not of existing fact, they are – at most – nonactionable statements of subjective future intent
   - Plaintiff does not allege that he took any specific actions in reliance on the alleged misrepresentations
3. **Age discrimination/wrongful termination claims**
   - There are insufficient factual allegations to support either claim, including anything connecting Plaintiff's termination to his age.
   - Plaintiff does not allege fact showing he refused (to DocuSign, as opposed to a subordinate of his) to do something illegal, or that he complained about illegal activity, or any connection with his termination
4. **Wage claim**
   - Unvested stock interest is not a "wage" under WA law, as it is not compensation that becomes due as a result of Plaintiff's labor; Plaintiff had a contractual right to future stock of unknown value that he only had an interest in if he remained employed until the date in question. Case law in the Amended Complaint itself (*Coulombe*) makes this exact point.

Please let us know by Tuesday if Plaintiff will agree to dismiss any or all of these causes of action; I am generally free early next week if you'd like to hop on the phone to discuss further. We appreciate your willingness to consider working through these issues informally.

Thanks,
Matt

**Matthew Jedreski** | Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8147 | Fax: (206) 757-7147
Email: mjedreski@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.